

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed September 26, 2007          **United States Bankruptcy Judge**



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In Re: | § | |
| | § | |
| JNS AVIATION, LLC, | § | CASE NO. 04-21055-RLJ-7 |
| | § | |
| Debtor | § | |

___

| | | |
|---|---|---|
| NICK CORP., | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| VS. | § | ADVERSARY NO. 04-2028 |
| | § | |
| JNS AVIATION, INC. aka JNS AVIATION | § | |
| GROUP, LLC, JNS AVIATION, LLC, | § | |
| JNS AIRCRAFT SALES, LLC, | § | |
| J. MALCOLM SHELTON, Individually, and | § | |
| JAMES N. SHELTON, Individually | § | |
| | § | |
| Defendants | § | |

## <u>MEMORANDUM OPINION</u>

The Court in this adversary proceeding considers (i) the claims by plaintiff Nick Corp.

against defendant Jim Shelton for fraud and fraudulent inducement, and (ii) Nick Corp.'s claim,

based on veil-piercing theories, that defendants JNS Aviation, Inc., JNS Aircraft Sales, LLC, J. Malcolm Shelton, and James N. Shelton should be held liable to Nick Corp. for the underlying claim it holds against JNS Aviation, LLC. In addition, the court addresses the objection to Nick Corp.'s proof of claim, such objection asserted by Kent Ries, the chapter 7 trustee in the JNS Aviation, LLC bankruptcy case, which matter was tried jointly with this adversary proceeding.

For ease of reference, defendant and debtor JNS Aviation, LLC will be referred to as "JNS Aviation"; JNS Aircraft Sales, LLC will be referred to as "JNS Aircraft Sales"; James N. Shelton will be referred to as "Shelton" or "Jim Shelton"; J. Malcolm Shelton will be referred to as "Malcolm Shelton." The Court will not employ an abbreviated name for JNS Aviation, Inc. As defendant JNS Aviation is the debtor in the bankruptcy case in which this adversary is pending, all defendants other than JNS Aviation – JNS Aviation, Inc., JNS Aircraft Sales, Jim Shelton, and Malcolm Shelton – will sometimes be collectively referred to as the "Non-Debtor Defendants."

The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). This Memorandum Opinion contains the Court's findings of fact and conclusions of law. Bankruptcy Rule 7052.

## I. Procedural History

Nick Corp. filed this lawsuit on February 12, 2004, as civil action number: 2-04-CV-035-J in the United States District Court for the Northern District of Texas, Amarillo Division. Nick Corp. asserted claims for (1) fraudulent transfers, (2) breach of fiduciary duties, (3) fraud, and (4) veil piercing. On September 2, 2004, JNS Aviation, the debtor, filed its voluntary petition under

chapter 7 of the Bankruptcy Code. On September 23, 2004, on JNS Aviation's motion, the lawsuit was referred to this Court and assigned adversary number 04-2028.

On October 21, 2005, Kent Reis, the chapter 7 trustee, filed his first motion to compromise claims raised in this adversary perceived to be held by him as trustee. By the terms of the settlement, Reis, as trustee on behalf of the bankruptcy estate, was to receive a settlement amount of $140,000, which amount he submitted was fair value for the fraudulent transfer claim. The settlement documents purported to dismiss *all* claims made by Nick Corp. in this adversary. Nick Corp. objected to the compromise. The Court construed the trustee's compromise as an attempt to settle only the fraudulent transfer claim without proper consideration given to the claims for veil piercing and breach of fiduciary duties raised by Nick Corp. or without sufficient consideration of whether the trustee even owned such claims. (No issue has ever been raised concerning the ownership of Nick Corp.'s direct fraud claims against Jim Shelton.) The Court directed Reis to file a formal election with the Court stating whether he intended to administer the two causes of action or to abandon them. Reis filed his election stating his intention to retain the two causes of action.

On April 21, 2006, Reis, as trustee, filed his second motion to compromise in which an attempt was made to clarify precisely what claims were being settled. The Court again rejected the compromise, in part because Nick Corp., as the major creditor, opposed the compromise. In the second motion to compromise, the trustee agreed to a settlement amount of $160,000 in resolution of all claims that the trustee held. Although the Court denied approval of the compromise, it stated in its Memorandum Opinion of September 26, 2006, that it would approve the $160,000 settlement as a resolution of the fraudulent transfer and breach of fiduciary duties

- 3 -

claims.  Such settlement was ultimately prepared by Reis and the defendants and was approved by the Court.  This adversary proceeding then proceeded to trial on Nick Corp.'s fraud claims against Jim Shelton and on the veil-piercing claims against the stated defendants in this adversary proceeding.

Nick Corp. timely filed its proof of claim in this bankruptcy case as an unsecured claim in the amount of $787,885.28.  The proof of claim amount is derived from the prior default judgment obtained by Nick Corp. in Delaware federal court against JNS Aviation in the amount of $1.8 million, with credits for the usage and sale of the airplane that was the subject matter of the Delaware suit.  Reis, as trustee, objected to Nick Corp.'s proof of claim and such matter was joined with this adversary for trial.

## II. Factual Background

The facts of this case arise from the relationship between Jim Shelton and Nick Lopardo that was forged from a meeting in Amarillo, Texas, in late March 2001 and from a series of e-mail conversations between the two concerning the purchase of a Beechcraft King Air 200 airplane.  In early 2001, Nick Lopardo ("Lopardo") was looking forward to retirement.  He was a successful executive with State Street Bank in Boston where, according to him, he had managed a portfolio of over $800 billion; he had served as chairman of the board of trustees of his alma mater, Susquehanna College; he had a winter home in Florida and he owned a minor league baseball team.  Lopardo manages his investments and operates his personal business affairs through entities he has formed for his convenience, all of which are owned by his holding company, Susquehanna Capital Mgt., of which he is the sole owner.

Jim Shelton is part of a ranching family in the Panhandle of Texas. He had an interest in airplanes. In addition to being a licensed pilot, Shelton apparently had a talent for refurbishing used airplanes and reselling them for a profit – at least that was the concept. As early as 1989, he and his brother Malcolm operated their own airplane business through their corporation JNS Aviation, Inc. To avoid certain tax ramifications adverse to them personally, JNS Aviation, Inc. was converted to a limited liability company. The conversion failed to fix the problem, however. They therefore formed JNS Aviation, as a new Texas limited liability company in 1999.

Lopardo was accustomed to traveling in corporate jets. As he was nearing retirement, he wanted his own plane, a plane he could use for his trips to Susquehanna College in Pennsylvania and in his travels for his various business ventures. His desire led him to Shelton. They hooked up in late March 2001 when Lopardo flew from Boston in a corporate jet furnished by State Street Bank to Amarillo, Texas, to look at planes that Shelton may have had for sale. Accompanying Lopardo were Bill Mehr, his pilot, John Werner, an airplane expert who was brought along to inspect any plane Lopardo might be interested in, and Al Melanson, Lopardo's personal bodyguard.

     A.  <u>The Meeting in Amarillo</u>

The facts concerning the meeting in Amarillo differ somewhat depending on who is doing the telling. Lopardo testified that he arrived on a Friday afternoon and was met at the airport by Bill Arnwine, an airplane broker, who worked principally with Shelton and JNS Aviation; that he, Arnwine, and Shelton went to dinner at a steakhouse in Amarillo. The next morning, according to Lopardo, he, Arnwine, Shelton and Lopardo's entourage went first to a hangar to review one aircraft, which did not interest Lopardo. They went to another, larger hangar, which, according to

Lopardo, Shelton referred to as "his" hangar. Several aircraft were stored at the second hangar. Lopardo testified that except for a helicopter and another small plane, Shelton referred to the planes at the second hangar as "his" planes. Lopardo said he was impressed with the number of aircraft and that he was satisfied that Shelton (and thus JNS Aviation) had a substantial operation.

Lopardo said that he and his group reviewed four aircraft at the second hangar – two King Airs, a King Air C90, and a Lear jet. Lopardo testified that Shelton told him that two of the four were for sale, one was already sold, and one was his personal plane. Lopardo testified that Shelton never told him that the four planes were not his (or not JNS Aviation's). Lopardo admired and was particularly interested in the plane that Shelton described as his personal plane, a King Air 200, which the parties referred to by its serial number, "BB-595."

Given his interest in BB-595, Lopardo had his airplane expert, John Werner, do a full-scale inspection of the plane. Lopardo was taken on a test flight in BB-595. Lopardo learned that BB-595 had twenty-five years of missing engine logs and that it had been owned and held outside the United States for many years. Regardless, it was really nice and Lopardo was very much interested in BB-595.

According to Lopardo, he left Amarillo the next morning, Sunday morning. Prior to leaving, and in perhaps the final face-to-face conversation with Shelton, Lopardo said he downplayed his interest in BB-595, noting especially that the missing engine logs hurt the potential resale value of the plane relative to Shelton's asking price (which was in excess of $1.9 million dollars). He also told Shelton that he did not intend to hold his first plane forever; he anticipated trading up to a bigger, nicer aircraft in the future. Lopardo testified that Shelton told

him that the missing engine logs were not a problem, which would be confirmed by Pratt & Whitney, the engine manufacturer, and that, besides, Lopardo could use the plane for thirty days and he (Shelton or JNS Aviation) would take it back with a full refund if Lopardo was not happy with the plane.  Finally, Lopardo said that Shelton also offered a long-term repurchase option on the plane that was conditioned upon Lopardo using Shelton as an agent for the purchase of his "follow-on" aircraft.[1]

Regarding the meeting in Amarillo, Jim Shelton denies ever discussing ownership of the hangars or planes.  He also said that he did not propose a long-term repurchase (or as he called it, "buyback") provision during the meeting in Amarillo.  He testified that he and Bill Arnwine took Lopardo and his group to view planes at both hangars the same Friday afternoon that Lopardo and his group arrived in Amarillo.  He said they first went to the "TAC Air" hangar located at the commercial airport where Lopardo landed; they then went to the second hangar located at the Tradewinds Airport approximately fifteen miles from the commercial airport.

Al Melanson's testimony supports Lopardo's story.  He said they arrived in Amarillo in the late afternoon and that it was the next day, a Saturday, that they were escorted to see the various planes in the two hangars.  He confirmed that Lopardo had no interest in any plane stored at the first hangar.  He also testified that, after the viewing at the first hangar, Shelton said, "let's go over to my hangar" and, while there, a conversation took place during which Shelton specifically said a helicopter and another small plane were not his.  Melanson testified that they

---

[1]The term "follow-on" aircraft is how both Shelton and Lopardo referred to Lopardo's next aircraft.  And, as is discussed in detail below, it is the term used in the Guaranteed Repurchase Provision which is appended to the Purchase Agreement that was entered into for the sale and purchase of BB-595.

all met again the next day, a third day, and he overheard Jim Shelton mention a "buyback" as part of a possible purchase.

It is not surprising that Melanson's testimony supports Lopardo's version of the Amarillo meeting. Melanson, who described himself as a "executive protection specialist," had worked at State Street Bank as Lopardo's personal security guard. After Lopardo retired from State Street Bank, Melanson continued on as Lopardo's security guard at Susquehanna Capital Mgt. He had therefore worked closely for Lopardo for several years, having left his employ a year and a half prior to trial.

John Werner's testimony regarding the Amarillo meeting was more supportive of Shelton's version. He testified that they were in Amarillo just two days, that they arrived early on Friday afternoon and went immediately to the TAC Air hangar. He did not recall Shelton making any reference to "his" hangar; he said he saw the TAC Air sign on the first hangar and assumed the hangar was owned by an entity named "TAC Air." He testified that Lopardo was very interested in BB-595 and therefore he (Werner) did a full scale inspection of BB-595. He was also impressed with BB-595. He said it looked new. Despite this, he pointed out two problem areas: (1) the missing engine logs, and (2) the foreign ownership – apparently BB-595 had been owned and kept in the Philippines for many years. He was impressed that BB-595 had low flight hours for a plane of its age (a 1980 model). He did not recall Lopardo ever mentioning Shelton's offer of a buyback provision. He was not with Lopardo for much of the time in Amarillo, however. Werner had been initially contacted by Lopardo's pilot, Bill Mehr. He is a self-described "pre-buy" inspector. Apart from traveling to Amarillo with Lopardo's group to

- 8 -

inspect planes for a potential purchase, he has no other connection with either Lopardo or Shelton. The Court found Werner's testimony particularly credible.

Bill Arnwine played a major role in bringing Lopardo and Jim Shelton together. In fact, he arranged the meeting in Amarillo. As mentioned above, he is an airplane broker, and he, along with Jim Shelton, met Lopardo's group upon their arrival in Amarillo. Arnwine had worked almost exclusively with the Sheltons for several years. Prior to the Amarillo meeting, he had been contacted by Bill Mehr concerning Lopardo's interest in aircraft, specifically Lopardo's interest in a King Air. Arnwine had a listing agreement through JNS Aviation for BB-595. Prior to the Amarillo trip, Arnwine had told Lopardo that the asking price for BB-595 was in the $2 million range and, though it was a 1980 model, it had been extensively refurbished. Arnwine obviously wanted to put a deal together so he could draw his broker's commission. As a marketing ploy, he took a photograph of Lopardo standing in front of BB-595 with the "TAC Air" hangar in the immediate background. He sent this photograph to Lopardo after Lopardo returned to Boston.

Arnwine had a close relationship with the Sheltons. After the events of September 11, 2001, Arnwine lost his job with a company selling airplanes and JNS Aviation had extended a loan to him to assist him financially. In addition, though not a lawyer, Arnwine had prepared several contracts for the sale and purchase of aircraft. As discussed below, he prepared the contract for Lopardo's purchase of BB-595. Arnwine's involvement is important, in part because it evidences that Lopardo had a specific interest in a King Air prior to his trip to Amarillo.

B. The E-Mail Negotiations for the Purchase of BB-595

The negotiations concerning BB-595 began in earnest upon Lopardo's return to Boston, and all conversations between Lopardo and Shelton took place via e-mail exchanges between the two.[2]

On March 31, 2001, Shelton e-mailed Lopardo to thank him for traveling out to Amarillo. Lopardo responded, stating he liked BB-595 (and another plane described as "886"), but emphasized the problem of the missing logs.

> jim: thank you also, It was a very interesting trip for me and I thoroughly enjoyed your hospitality.  I loved your plane and hope that we can have the opportunity to discuss a possible deal.  I enjoy the way you approach business and perhaps we can do some things together in the future.  I also hope you didn't mind the rather detailed and somewhat "annal" approach to reviewing these aircraft but I am also a "perfectionist in an imperfect world"; I do my homework thoroughly and act promptly when I have the info, and am satisfied.  John is probably one of the best experts on king airs in the world and I trust his opinions.  I would say honestly that the lack of logs prior to the overhauls is troublesome to him and somewhat to me as my plan would be to sell this aircraft in a few years to move up in capability.  however, the plane remains a viable possibility as we try to narrow our search and make a decision.  I would say that we also liked 886 and could see myself making that decision including a new paint and interior job. jim: we have a few more craft to l;ook at in the next few weeks and then will come back to you.  thanks for your time, I also realize it is as vvaluable as anyone's .. regards, nick

Pl.'s Ex. 23.

The next day, April 1, Shelton responded, specifically addressing the problem of the missing engine logs.

> nick  thanks for the quick reply   I agree that john seems to have it all figured out when it comes to the kingair   remember that the logs that are missing are in regards to the engines previous to the pratt and whitney tear down and test cell runs   once pratt and whitney has done an overhaul inspection and verified the internal parts as well as done a test cell performance run   It negates the need for previous logs on the engines (It would be a plus if they were included but in my experience with the sale

---

[2]As part of the factual statement the Court incorporates many of the e-mail exchanges between Lopardo and Shelton.  The e-mails are reproduced exactly as they appear from the copies introduced into evidence.

of these airplanes pratt and whitney is the deciding factor) . . . john told me himself that if we had the logs from the pratt and whitney inspection forward he felt it would not be a problem. . . . If that is not a recomendation that you are comfortable with I certainly understand but remember this   which I might not have mentioned   you fly our aircraft away for 30 days   If for any reason you are unhappy just return it for a full refund no questions asked    886 is certainly an outstanding aircraft in its own right and we will do all that is necessary to consumate any transaction that will make your venture into aircraft ownership a successfull and happy one   please let us know what we can do to help you in your decision down the road    If you decide on our aircraft we would be happy to buy it back from you at a substantial value if we were involved in the purchase of your next aircraft   we are not concerned with owning the lowest kingair of this vintage again   and would be more than happy to give you a buy out that you can be confident in    we operate above board and will offer you the references you need to be comfortable    I really did enjoy our time together   and indeed there might be something we can do together in the future   airplane or not   thanks again for the effort you have made regarding your involvement in the kingair 200 business

Pl.'s Ex. 23.

Lopardo's interest quickened as evidenced by his response, also on April 1:

jim: thanks; I agree with your assessment of BB595 and quite frankly so does john - he was not particularly concerned about the logs given the p+w overhall. my budget for this endeavor did not anticipate 1.9million but I really like the plane and wonder if you have any room in the number. if we can agree on a price that your comfortable with and I can accomodate in my planning, I think we can do this deal pretty quickly. I'd like to do a deal with you because I anticipate we'll do other deals with aircraft in the future so I'd appreciate you "best" price on both aircraft and we'll try to make it work early this week. If you can't move on the price with these two craft, would you be willing to have me retain your services to look for the best king 200 we can find within my budget ($1.4-1.6) and help me acquire it - I value your knowledge of this business and your familiarity with these planes and would be willing to compensate you for this effort. (I am hooked on BB 595 however)   regards, nick

Pl.'s Ex. 23.

By his response, Lopardo was raising the prospect of possible future purchases of aircraft, and of using Shelton in some fashion for such purchase, as a means to encourage Shelton to reduce his price on BB-595.

That same day, April 1, Shelton told Bill Arnwine, the broker, that he was approaching a

deal with Lopardo and alerted him to his (Shelton's) buyback proposal:

> bill  this is a little more encouraging  I have told him there is room to trade on 595
> depending on the amount of work he would like us to do  also I have talked about
> a buy back option in the future  so if he asks you about it don't be suprised  just tell
> him  with in the first year we would buy the airplane back for the original purchase
> price less 500 dollars per hour flown  after that it goes to 80-90% depending on the
> condition of the aircraft  all this is predicated on him staying hooked up with us on
> his next purchase  <u>it is not a take the airplane back deal by itself  he has to be buying
> another plane from us</u>  the only other thing that bothers me is what he says his
> budget is  1.4-1.6  jim

Pl.'s Ex. 23 (emphasis added).

The next day, April 2, Shelton submitted to Lopardo a proposal for BB-595 and, in

addition, mentions another plane, referred to as BB-886:

> Subject 200
> nick  Here is a list of what I have come up with on bb595  We will sell the airplane
> for 1,925,000.  This price includes raisbeck mods  1. Enchanced leading edges  2.
> Ram air  3. Dual aft strakes  aircell phone agt-01 ground and air  avionics insurance
> for 1 year  fresh phase 1-4 inspection (this will make the aircraft current on all
> inspections for the next 200 hours - at that time you start the process over with a
> phase 1 inspection and another phase every 200 hours  all 4 need to be completed
> within a 2 year window gauranteed buy back  30 day return no questions asked
> policy . . . as far as bb886 is concerned here is what I see based on what I have heard
> from the owner  price 1750000 paintant  maintenance  1925000  8 weeks down
> time . . . with his there wont be the avionics policy or the 30 day return or the buy
> back  I don't think he willagree to a phase 1-4 but he might  now remember 886 is
> not mine  to get a better idea of where the owner will be  let me take him an offer
> then I can find out where his bottom is  it is very difficult to get someone to give you
> their bottom dollar with out an offer first  once I have an offer in hand he will take
> selling the airplane a lot more seriously and counter etc.  Then the process can begin

Pl.'s Ex. 24.

BB-886, the other plane referenced in Shelton's e-mail, was an alternative to BB-595.

Lopardo apparently had little interest in the plane. His response addressed the price of BB-595

and did not otherwise mention BB-886:

> I am going to review your ask with my financial people to see if the numbers work based on our revenue projections. I was more in the 1,725,000 range as to my expectations but I will review the numbers as mentioned. I know I could do the deal Wednesday at my numbers but will have to se what the financial projections say at 1,925,000. I will be in touch as soon as I can this week, hopefully by Thursday at the ;latest. nick

Defs.' Ex. 164.

> Shelton, sensing he was on the verge of a deal, told Lopardo:

> If I could sell it any lower I would   I just can not replace this aircraft with inventory that does not even relate to it   and basically that is all that is available right now   if you would like to try the owner of bb886 I would be happy to make a run at him for you and give it my best shot   let me know   jim

Defs.' Ex. 164.

> The next day, Arnwine chimed in, as follows:

> Nick – I wanted to add my comments to what you've heard from Jim already. We appreciated the opportunity to host you, Bill, John and Al in Amarillo, particularly considering the major effort you went to in finally departing Boston. Attached is the picture I took of you in front of (what we hope will be) your new airplane! It appears you and Jim have matters pretty well in hand with regard to negotiations. He is at his ranch today, so is a bit out of touch, but will return tonight or tomorrow. Please don't hesitate to call on my if I can help . . . Best regards, Bill Arnwine

Defs.' Ex. 164. The photograph referred to in Arnwine's e-mail is the one mentioned above of Lopardo with BB-595 and the "TAC Air" hangar in the immediate background.

Lopardo, still negotiating, took a harder negotiating posture with Arnwine and Shelton,

stating the following:

> hi bill; thank you for your e mail. I love jim's plane but I'm afraid that we are too far apart to make a deal. I have what I think is homework on the plane and I come up

> with a value of $1,485,000 based on blue book and comparables . . . bottomline, I can
> see myself paying about $1,700,000. I understand jim's feeling - it's his baby and I
> respect that but I don't believe the craft justifies $1.9mm+; just my opinion.  I am
> debating whether to make an offer on BB886 and my analysis comes out about
> $1.4mm to which we'd need paint and new interior plus dvd,cell. I have financing
> lined up but can't seem to get my mind around numbers that are being quoted . . .
> regards, nick

Defs.' Ex. 164.

On April 4, the deal became imminent when Lopardo offered to pay $1,850,000 for BB-

595:

> hi jim: here is where I am at:  I am prepared to offer you $1,850,000 for your aircraft
> (BB595) inclusive of the ad-ons we discussed. I would be prepared to have john
> werner come to amarillo to do a pre-buy inspection at your earliest mutual
> convenience. I would wire a deposit check to you for $100,000 by Friday.  nick

Defs.' Ex. 164.

On the same day, Shelton proposed they settle on $1,890.000.  Lopardo responded, "I

will let you know before 5p this afternoon.  I assume the buy-back and 30 day clause would stay

in effect- or not?"  Defs.' Ex. 164.  Shelton told Lopardo the following: "Yes the buy back and

the 30-day would remain solid   Jim."  Defs.' Ex. 164.  Therefore, in early afternoon on April 4,

2001, Lopardo said they had a deal and Shelton confirmed the basic terms:

> That's great nick  thankyou  the first thing we need to do is write down the specifics
> of the deal  I will send to you the way I see it  you may change or add to the things
> you would like  Selling price is 1890000 . . . the 30 day return( this is not intended for
> you to return the aircraft just because you are tired of it or it doesn't go fast enough
> but if it is not performing to the standards it should be  or you are having problems
> that can not be resolved to your satisfaction, that is the purpose for this provision),
> the buy back provision( this is offered to you to give you good value for your next
> aircraft and that aircraft purchase through jns aviation.  1st year deduct 500
> dollars/hour, 2nd 85% of the purchase price, 3rd year 80%, and 4th year 75%)  these
> figure will be calculated using the 1890000 purchase price.

Defs.' Ex. 164.

C.  The Purchase Agreement and the Guaranteed Repurchase Provision

Arnwine prepared the contract for the sale.  The contract, titled "Purchase Agreement," is dated April 6, 2001.  It recites on the first page that JNS Aviation is the "Seller" and Kahuna Partners III, LLC, a Massachusetts corporation, is the "Purchaser."  The aircraft is specifically described as a Beechcraft King Air 200, serial number BB-595, registration number N927JC; the engine make and model is described as a Pratt & Whitney PT6A-41.  The purchase price is $1,890,000.  Delivery was set for May 7, 2001, at Wilmington, Delaware.  The base contract is the Purchase Agreement, which is five pages long.  Attached to the Purchase Agreement are the following:  Appendix A, which describes the aircraft and its specifications; Appendix B, which is a Delivery and Acceptance Receipt; Addendum 1, which is the "Guaranteed Repurchase Provision" setting forth the terms of a possible repurchase of the aircraft; Amendment 2, which itemizes a price adjustment to cover additional modifications done to the aircraft; Amendment 3, which identifies an escrow holdback; and Amendment 1, titled "Assignment of Purchase Agreement," which refers to the Purchase Agreement as between JNS Aviation and Kahuna Partners III, LLC and that they "agree to an assignment of the entirety of the purchase agreement from Kahuna Partners III, LLC to Nick Corp."

The base contract, the Purchase Agreement, which as stated above, is dated April 6, 2001, is signed by Shelton for JNS Aviation and by Lopardo for Kahuna Partners III, LLC.  Appendix A is not separately signed.  Appendix B is signed by Lopardo as manager of Kahuna Partners III, LLC, as purchaser.  Addendum 1, the Guaranteed Repurchase Provision, which is also dated April 6, 2001, is signed by Shelton for JNS Aviation, seller, and by Lopardo for Kahuna Partners III, LLC, purchaser.  Amendment 2, which details the revised purchase price, is dated May 10,

2001, and is signed by Shelton for JNS Aviation and by Lopardo as president of Nick Corp., as

purchaser. Amendment 3, also dated May 10, 2001, is signed by Shelton for JNS Aviation and

Lopardo for Nick Corp.

Addendum 1, the Guaranteed Repurchase Provision, states in relevant part as follows:

[I]f, within the first 30 (Thirty) days after the date of Closing and Delivery, the
Aircraft does not perform to acceptable standards as published in the Pilot's
Operating Handbook, or if previously undiscovered faults or defects render the
Aircraft unsuitable for its intended use, or if expensive repairs are required to remedy
such faults or defects, Seller agrees to refund to Purchaser the entire Purchase Price
for the Aircraft . . . .

In the event Purchaser elects to upgrade to another aircraft within 48 (Forty-eight)
months of the date of Closing and Delivery, Seller and Purchaser agree to the
following provisions for a guaranteed repurchase (hereinafter "Repurchase") of the
Aircraft from Purchaser. These Repurchase provisions apply only in the event that
Purchaser elects Seller to act as agent in the negotiation and purchase of the
Purchaser's follow-on aircraft:

1.   Within 12 months of the date of Closing and Delivery, Seller
     will repurchase the Aircraft using the original Purchase Price
     as a basis, and deducting $500 (Five Hundred Dollars) per
     flight hour flown since the date of Closing and Delivery;

2.   Within 13 to 24 months of the date of Closing and Delivery,
     Seller will repurchase the Aircraft for 85% (Eighty-five
     Percent) of the original Purchase Price;

3.   Within 25 to 36 months of the date of Closing and Delivery,
     Seller will repurchase the Aircraft for 80% (Eighty Percent) of
     the original Purchase Price;

4.   Within 37 to 48 months of the date of Closing and Delivery,
     Seller will repurchase the Aircraft for 75% (Seventy-Five
     Percent) of the original Purchase Price.

Pl.'s Ex. 21.

Nick Corp. paid the purchase price and took delivery of BB-595 on May 11, 2001. At the time of sale, legal title to BB-595 was held by JNS Aviation, Inc. Pl.'s Ex. 112. Despite this, JNS asserted a 50% ownership interest in BB-595, having sold a participating interest in the remaining 50%.

Though Lopardo signed the Purchase Agreement, Appendix B, and the Guaranteed Repurchase Provision, for Kahuna Partners III, LLC, the purported purchaser and assignor, such entity never existed. Lopardo testified that he first became aware of this a few months prior to trial.

D. Invocation of the Repurchase Provision - More E-Mails

Lopardo's affinity for BB-595 did not last long. The tires on BB-595 became "flat spotted," arguably due to pilot error, and it had throttle problems. Lopardo replaced his pilot Bill Mehr with Greg Livenois in June 2001. Greg Livenois reported that the plane had difficulty reaching optimum speed at high altitudes as its engine was burning at a high temperature. (It was later learned that the engine was in fact running within a temperature range established for the plane.) In any event, by the summer of 2001, a few months after Nick Corp.'s purchase, Lopardo wanted a bigger, nicer, faster aircraft. On July 31, 2001, he e-mailed Shelton making a specific request regarding the repurchase of BB-595 and the purchase of another aircraft:

> what I think I want to do is as follows: 1. ask you to act as my agent in repurchasing BB595 and purchasing another aircraft. 2. I would like to purchase a 350 and would like to try to negotiate a deal on FL 225 asking price 3,950,000 3. I would like to offer 3,500,000 or less for the aircraft 4. I would include the proceeds from the buyback to youand 1,000,000+ In cash with the balance financed. all above subject to appropriate pre-buy and agreement between you and me on working the deal. I want the 350 for personal reasons or additional room and passengers and additional avionics as I will be flying it farther and more often. I'd appreciate your thoughts.

another thought I had was purchasing a brand new 200 If one could be found. Regards, nick p.s. selinsgrove is 3800ft.

Pl.'s Ex. 42.

While there is no evidence of an immediate response by Shelton to Lopardo's request,

Lopardo apparently learned of some reluctance on Shelton's part regarding his proposal as, on

August 3, 2001, he followed up with Shelton, stating as follows:

> jim, I think the botomline on all this is   I WANT TO DO IT assuming we can get a good deal. I also would like to use you rather than go outside - your call.

Trustee's Ex. 3.

The parties had apparently had some discussion concerning the ability of BB-595 to

handle the trips between Boston and Selinsgrove, hence Lopardo's reference to the elevation of

Selinsgrove.[3]  Shelton's response, on August 3, 2001, addressed this concern and, specifically, his

asserted inability to follow through with the repurchase:

> nick   I have run the numbers   the 200 will do the trip . . . again I say with all seriousness   the 350   carrying any kind of load on a warm day cant legally takeoff from selinsgrove( on an 80 degree day the takeoff requirements will be over 3800 feet)  But the bottom line is what you said   YOU WANT TO DO IT   and that is the bottom line  that is great  how best to proceed is to lay it all out  I have been caught flat footed here  I have extended my line and have no room to buy additional aircraft and the 200 market as you know is as soft as it has been in years   the 350 market however with only 27 aircraft now available for sale is not  . . . I never dreamed you would come back in 5 months and want to trade airplanes  I also thought I would be taking the aircraft back in inventory at a reduced price as opposed to the selling price  so I have been going merrily along not thinking or planning for that contingency  nick, I lost a lot of money on bb595  which is not your problem  your main concern is to get your money out of 595   I can still do a job for you   the only way I could take 595 back today considering my banking problems is to do a project  when I say a project I mean find a 350 that needs new engines new paint new interior and inspections   which I believe I have   I need greater margins than just a brokerage fee

---

[3]It is the Court's understanding that Selinsgrove is in Pennsylvania.

acting as your agent to purchase someone elses aircraft <u>my business is in dire strates
and I cant afford another big loss on an aircraft or I will be out   it is that simple . . .
nick I hate begging   but I am in I difficult position and it is a humbling experience
I have never in my life not been able to hold up my end of the bargain   but this is the
case here   if I cant do a project   where I can make margins I wont be able to help on
this deal   I am sorry</u> . . . my margins are made on the front end   they are made from
the seller   who knows his airplane needs some work   they are made from the engine
overhaul shop   because all are wanting to do the work   they are made from the paint
and interior shop   for the same reason   it allows me to make more money and still
deliver an aircraft that is priced within market parameters   so if we can do this it
would help me greatly function to some degree according to the contract   it would
provide you an out on the 200 and it would bring to your door   a 350 that is exactly
like you and your family want   you have seen the quality of work I can turn out   I
know you were fairly happy with the way 595 turned out and how the transaction
took place   I can perform on this one as well if given the chance   jim

Pl.'s Ex. 43 (emphasis added).

Lopardo backed off his demand.

jim: WHOA - I had no idea AND it is not my intention to stick you. I respect your
business approach.  let's slow down a minute knowing this now. I'll be back to you
soon. I an not about to put a friend out of business.  nick

Pl.'s Ex. 43.

Shelton and Lopardo then spent a few days discussing the possibility of a "project" by
which Shelton would find a plane acceptable to Lopardo and which, with improvements and add-
ons installed by Shelton (JNS Aviation), might allow Shelton to achieve the "margins" he needed
to perform under the Repurchase Provision.  These discussions proved to be unsuccessful as, on
August 8, 2001, Shelton told Lopardo that he could not make such a deal work:

After looking at the cost of these things   and trying to accomplish what I am trying
to do by taking BB595 back into inventory   I don't think I could participate in the
options   with the margins what they are   I apologize for that

Trustee's Ex. 3.

Following Shelton's response, the discussions became more pointed, as Lopardo told

Shelton the following:

> I need to review my options in light of your inability to perform on the contract (guaranteed buy-back). I don't want to push it as some have told me to do. regrettably, the industry refuses to even consider BB595 at more than 1.3 million and everyone is quick to tell me the negative impact of the missing logs (regardless of the engine overhauls). I understand your financial realities and I am not about to make life miserable for you if the buy back does not work. I am meeting with a beechcraft sales rep on Saturday to consider a new aircraft - it is one of the few ways I might recover my investment in BB595 and at the same time get the options I want in a new aircraft. . . . I want to be straight with you as I have always been and tell it like it is! nick

Trustee's Ex. 3.

It was then clear to Lopardo that Shelton (JNS Aviation) would not repurchase BB-595 in

accordance with the Guaranteed Repurchase Provision and because of this he was exploring

ways to dispose of BB-595 while, at the same time, making sure that Shelton (and JNS Aviation)

was aware that they were not off the hook for any shortfall realized by Lopardo's (or Nick

Corp.'s) failure to obtain the buyback price. Two days later, on August 11, 2001, Lopardo told

Shelton he was about to buy a new aircraft, a "brand new King 350." He said he was having the

engines on BB-595 checked and that, "if the engines do have a major problem, it [would]

seriously impair [his] ability to realize a reasonable number on a trade." Pl.'s Ex. 44.

Shelton responded, again concerning the claimed deficiencies of BB-595, stating as

follows:

> I pampered this aircraft during the time I owned it   never failing to address the smallest of deficiencies   which the shop here would would confirm   but my only deficiency would be the contract which I have said I am sorry for making a mess of  I have tried to accomplish your purchase price of 1890000 if I could do a project for you   a 1992 model with new everything for 3.2mm   which falls inline with what is out on the market as we speak . . . I know you must think I am someone who has been out to stick it to you   but I am not   I made a mistake in putting an overzealous

- 20 -

contract together but it does not reflect on any of the aircraft sales I have made in the past   I have truly tried   with all my heart to make each deal a good deal for the customer   even when I knew I would be losing money on the sale   I am trying to be as honest as I can be   unbiased and truthful as far as the 350 deal is going and the performance of the engines   and aircraft in general (595)   I think now it is time to examine the motives for the 350   and examine the info you are receiving from pilots and salesmen alike   I say again I appreciate you honesty   I hope you apprecaite mine and hope you will keep me informed every step of the way   jim

Pl.'s Ex. 44.

Lopardo responded by simply stating he wanted Shelton and JNS Aviation to repurchase

BB-595 in accordance with the contract; that they should wait on the engine inspection before

further accusations are made.

The tone changed somewhat after Lopardo received the results of the engine test on BB-

595.  On August 17, 2001, he informed Shelton of the results of the engine tests and suggested

alternatives to the buyback:

hi jim: great news- BB595 engine power test was perfect (just like you said). now, I can move forward on my plans. I have purchased FL 332 A BRAND NEW KING AIR 350 which will be delivered at the end of sept. early October. we are now discussing plans for bb595.  in that regard, I am considering several options:  1. out right sale 2. sale lease-back to current FBO 3. lease with option to but from an aircraft business 4. retain and utilize as a charter in current FBO business   in addition to the above, I'd like to ask you to consider a proposal which might accomplish something along the lines of the buy-back with a discount from the purchase price I paid or some arrangement that would pay me over time. pls. note that I'd hope to accomplish one of the 1-4 approaches above but feel compielled to at least ask you to consider thinking about how I might accomplish a recoup of something close to the 1,890,000 purchase of BB595. I will say that my desire would be to try to recoup at least 1,590.000.  thoughts??????????  NICK

Trustee's Ex. 3.

Two days later, on August 19, 2001, Shelton responded as follows:

That is good news( engines) . . . as far as your options are concerned regarding bb595 all 4 seem to be plausible   you might study the charter market   this could generate

a lot of cash towards reducing the purchase price of 595   the market in the boston
area should be very good   it would not be so good in the amarillo market   as far as
an outright sale of the aircraft   I think 1.4mm on todays market would be a descent
price but not what you are looking for . . . this market on the 200s has crashed since
spring  I would be happy to take the airplane back at some value ( as I said before the
bank will not loan me any more money until I sell something)   if I could move my
current inventory  but it is extremely slow   I don't know if this is a business that I
can stand for too long  if I don't have some activity  soon  as I said before or maybe
I did not   I lost 200000 plus on 595  and a couple of 200s before that did not treat me
kindly  I am trying to weather the storm on this business   but  to be perfectly honest
 if I don't sell what is in my inventory   within a reasonable time frame   I am not
going to be around to long   at least as far as selling airplanes is concerned   I guess
what I would suggest   is try to hold on to the airplane if you can by doing the charter
deal ( always having 595 for sale, and making sure the charter company knows the
airplane could be sold tomorrow)   this allows you to wait for a better market  . . . I
would pay advertising and all other associated costs of selling this aircraft with no
charge what so ever to you   at this point in time

Pl.'s Ex. 63.

Then, on September 2, 2001, Lopardo made the following proposal:

jim: I have decided that I will not want to keep 2 aircraft upon delivery of FL332;
therefore, I would like to propose the following: I would like to invoke the buy-back
provision of our contract addendum 1 - guaranteed repurchase provision with the
following stipulations:  1. you will have an exclusive to sell the aircraft. 2. I will pay
you $60,000 if you sell the aircraft as follows: $60k within 1 month; $50k within 2
mos. $40k within 3 mos, minimum $30k thereafter. 3. I will give you 120 days to sell
the aircraft. 4. I will ask the current operator to also explore sales and if successful will
pay you 50% of the above deal in item2.  5. all inspections for sale will occurr in
laconia base or in selinsgrove; I will consider flying the aircraft to a potential buyer
at my discretion. 6 asking price $1 ,800,000 and I will lower the guaranteed
repurchase price to that amount.  I regret having to do this but I have explored all
possibilities in keeping two aircraft to no avail.  please respond how you would like
to proceed.  thanks, nick lopardo

Pl.'s Ex. 71.

Shelton simply responded by offering to market BB-595 for Nick Corp. at no cost.  JNS

Aviation was unable to honor the buyback provision.  Lopardo's response was firm.  He

informed Shelton that if he (and JNS Aviation) could not perform under the agreement, he would

"take other actions." Pl.'s Ex. 71.

Lopardo and Shelton then retreated for a few weeks, perhaps hoping the market and the

marketability of BB-595 would improve. The truce ended in early January, 2002, however. On

January 2, 2002, Lopardo e-mailed Shelton:

> I will be coming to you shortly to invoke the buy-back provision of BB595. I had
> hoped I could wait till mar1 however, I will need to act probably by feb1. the aircraft
> has flown only about 70 hrs since purchase, has been hangared the entire time, has
> had numerous squaks repaired and or looked after immediately by rqytheon team at
> hanscom airport in bedford.ma. it is precisely in the condition I received it! I wished
> that I could have sold it on the open market but that was not successful. I'd
> appreciate your response as to the suitability of repurchase on feb 1 or thereabout and
> your thoughts on how we might go about the transaction. please advise. regards, nick

Pl.'s Ex. 63.

Shelton's response of January 7, 2002, caused any semblance of a cordial relationship

between the two to end:

> nick  I have been giving your desire to invoke the buy back provision concerning BB-
> 595 some thought. I have told you in the past that jns would do all we could to honor
> the contract we had with you regarding this aircraft. I believe the buy back provision
> has been breached by your purchasing the 350 from raytheon without allowing jns
> to participate. If there is something you feel I am missing please feel free to contact
> me. Sincerely jim

Pl.'s Ex. 63.

Five days later, on January 12, 2002, Lopardo advised Shelton that he was turning the

matter over to his attorney and further reiterated to Shelton that the other plane that he

purchased, the 350, was a separate aircraft owned by another company of his, Kahuna

Consulting of New Hampshire LLC,[4] which operated the aircraft for his business affairs, separate from his personal affairs which were operated through Nick Corp. At the time, he had apparently purchased another plane, referred to as N927JC, through Nick Corp. which was to be used as his private plane.[5]

      E.  Suit Filed in Delaware Federal Court and Entry of Default Judgment

Litigation ensued as, in April, 2002, Nick Corp. sued JNS Aviation in Delaware federal court. Jim and Malcolm Shelton, as owners of JNS Aviation, made an affirmative decision not to defend the lawsuit. On June 12, 2002, the United States District Court for the District of Delaware entered a default judgment in favor of Nick Corp. and against JNS Aviation for the sum of $1,800,000 (the "Default Judgment").

      F.  The Rest of the Story

On May 30, 2002, between the time of the filing of the Delaware suit and entry of the Default Judgment, Jim and Malcolm Shelton formed JNS Aircraft Sales as a New Mexico limited liability company. By early July 2001, the Sheltons had transferred the assets of JNS Aviation to themselves personally as "members" of JNS Aviation and then, in turn, to JNS Aircraft Sales.

Janet Collingsworth, a CPA that testified for Nick Corp., reviewed the financial information of JNS Aviation and JNS Aircraft Sales. She concluded that JNS Aviation was in basically the same financial condition in early 2001 as it was in late 2001, before and after the sale of BB-595. She confirmed that JNS Aircraft Sales was simply a continuation of the same

---

[4]This is not the same company as the purported purchaser under the Purchase Agreement, Kahuna Partners III, LLC.

[5]The Court notes the irony of creating a company to own a plane that is used solely for "personal" trips.

- 24 -

business as was carried on by JNS Aviation, and that the assets and liabilities were essentially the same, except for the liability (from the Default Judgment) to Nick Corp. Her analysis revealed that JNS Aviation did not have available cash with which to repurchase BB-595, though there was a possibility that JNS Aviation might have room under its line of credit with FNB Amarillo to buy back BB-595. Drawing against the line would have left JNS Aviation without an immediate source of revenue to repay against the line, however.

Jim Shelton testified that JNS Aircraft Sales was formed to attempt to avoid Texas personal property taxes. The accountant for the Sheltons and their various entities, Cary Buchanan, testified that he advised the Sheltons to form a New Mexico LLC as a way to possibly avoid Texas property taxes on airplanes. He readily admitted, however, that the physical location of the property, rather than the state of incorporation, determined the proper state that could levy such a tax. Buchanan also testified that JNS Aircraft Sales did not specifically assume the debts of JNS Aviation, except a "back note," which the Court assumes was the line of credit JNS Aviation had with FNB Amarillo. At the time of the transfer, JNS Aviation had no aircraft remaining in its inventory, having sold its last plane in March 2002.

The Sheltons owned other companies which were apparently formed for their ranching businesses. Such companies, along with JNS Aviation and JNS Aircraft Sales, shared the same business office located in a hangar at the Tradewinds Airport in Amarillo, Texas. The hangar was owned by yet another company, JNS Management, LLC. Their various companies had one employee and all used the same bookkeeper. The evidence reflects two instances of the Sheltons' using their entities for personal purposes. JNS Aviation carried on its books and made payments on a condo owned by the Sheltons personally. The Sheltons also made substantial

- 25 -

"distributions" to JNS Aviation that JNS Aviation carried as loans on its books (and not otherwise documented) and repaid to the Sheltons with interest. The Court assumes that such "loans" were used by JNS Aviation to pay down on its line with the bank. The evidence as a whole, however, reflects that JNS Aviation and JNS Aircraft Sales were maintained as separate and distinct entities. JNS Aircraft Sales obviously has a similar name as its predecessor and it is engaged in exactly the same business.

JNS Aviation and JNS Aircraft Sales did not maintain a ready inventory of planes for sale; they were not like a used-car business with multiple cars for sale. At any one time, they may have had no more than one aircraft for sale, such as BB-595.

As for Nick Lopardo, Nick Corp., and BB-595, Nick Corp. held the plane until February 2005 when it sold BB-595 to Aero Toy Store, LLC for just under $1 million. Nick Corp. had previously been offered $1.3 million for BB-595 as part of a purchase of another aircraft. The other aircraft was not purchased, however.

Lopardo, through his various entities, has, since 2001, purchased four planes – BB-595, a King Air 350, a 400 Beech jet, and a Hawker jet.

Nick Corp. filed its proof of claim in JNS Aviation's chapter 7 case, asserting an unsecured claim of $787,885.28, which reflects the credit for Nick Corp.'s sale of BB-595 against the Default Judgment.

### III. Legal Analysis

A. The Parties' Contentions

As outlined above, by the time of trial, Nick Corp. was left with its fraud claim against Jim Shelton and its veil-piercing claims against defendants JNS Aviation, Inc., JNS Aviation, JNS

Aircraft Sales, Jim Shelton, and Malcolm Shelton. Nick Corp. asserts the veil-piercing theories of (i) single business enterprise, (ii) sham to perpetrate a fraud, (iii) evasion of existing legal obligation, and (iv) alter ego. As for the veil-piercing theories, Nick Corp. is specifically seeking to recover from the defendants other than JNS Aviation, i.e., the Non-Debtor Defendants, for the Default Judgment it holds against JNS Aviation.

The Non-Debtor Defendants generally dispute both the fraud claims against Jim Shelton and the various veil-piercing theories asserted against them collectively; the Non-Debtor Defendants, in addition, contest the underlying breach of contract claim that resulted in the Default Judgment, and thus the right of Nick Corp. to rely upon the Default Judgment as a basis of liability. On this latter point, the Non-Debtor Defendants argue that since they were not parties to the breach of contract suit by Nick Corp. against JNS Aviation, and given that Nick Corp. is, in the present action, seeking recovery against each of them individually, they are entitled to contest the breach of contract claim. They raise the following defenses to the breach of contract claim: (i) that JNS Aviation did not breach the Purchase Agreement or any part thereof, specifically the Guaranteed Repurchase Provision, and (ii) that Nick Corp. holds no cause of action or claim for breach of the Purchase Agreement as the Purchase Agreement was never formally assigned by the stated purchaser under the Purchase Agreement, Kahuna Partners III, LLC (or Nick Lopardo if he is deemed to be the real party to the Purchase Agreement), to Nick Corp. The logic of their argument is as follows: If the breach of contract claim fails, for whatever reason, then the piercing theories are rendered moot because there is no underlying liability – i.e., no debt owed by JNS Aviation to Nick Corp.

By way of response to this threshold question of whether the Non-Debtor Defendants can now contest the validity of the breach of contract claim, Nick Corp. argues that the Non-Debtor Defendants are barred from relitigating the breach of contract issue, given that the Default Judgment was entered by the Delaware federal court on Nick Corp.'s claim against JNS Aviation. Nick Corp. points out that this Court has already resolved this question by its Memorandum Opinion of August 10, 2005, in which it held that res judicata barred the Sheltons from disputing the claim asserted by Nick Corp. in the JNS Aviation bankruptcy case.

Given the complexity of the veil-piercing theories and the threshold questions that have been raised concerning Nick Corp.'s underlying claims, the Court first addresses the veil-piercing claims of Nick Corp., beginning with the issues raised regarding the underlying breach of contract and the Default Judgment. The Court will then address Nick Corp.'s fraud claims against Jim Shelton.

     B.  <u>Attempt to Relitigate the Underlying Breach of Contract Claim</u>

          1.  <u>The Remedial Nature of Veil-Piercing Claims</u>

Texas law holds, as the Non-Debtor Defendants have noted in their briefs filed with the Court, that an assertion of veil piercing or corporate disregard does not create a substantive cause of action, that such theories are purely remedial and serve to expand the scope of potential sources of relief by extending to individual shareholders or other business entities what is otherwise only a corporate liability. *In re Texas American Exp. Inc.*, 190 S.W.3d 720 (Tex. App.--Dallas 2005). The Texas Supreme Court in *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986), stated that the purpose of piercing is to prevent the use of a corporate entity as a cloak for fraud or illegality or injustice and that the purpose should not be thwarted by adherence to any

particular theory of liability. *Id.* at 273. Nick Corp. is attempting to recover from the Non-Debtor Defendants for the claim it holds against JNS Aviation. This presupposes the existing liability of JNS Aviation to Nick Corp., which is appropriate in light of the Default Judgment. The Non-Debtor Defendants are doing nothing more than attempting to relitigate the breach of contract claim from JNS Aviation's perspective, i.e., standing in JNS Aviation's shoes. As Nick Corp. correctly observed in its brief, the Court has previously held that the Sheltons are barred by the principles of res judicata from contesting, on behalf of JNS Aviation, the breach of contract claim. *See* August 10, 2005 Memorandum Opinion.

### 2. Res Judicata Requirements

"Federal law determines the res judicata effect of a federal court judgment." *Meza v. General Battery Corp.*, 908 F.2d 1262, 1265 (5th Cir. 1990) (citing *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1124 (5th Cir.1987)); *see also* Restatement (Second) of Judgments, § 87 (1982). For res judicata to apply, four requirements must be met: (1) the parties must be identical in both suits; (2) the prior judgment must have been rendered by a court of competent jurisdiction; (3) there must be a final judgment on the merits; and (4) the same cause of action must be involved in both cases." *Id*. at 1265. There is no question here concerning whether the Default Judgment was rendered by a court of competent jurisdiction or that it is a final judgment on the merits. By the Court's analysis, the first element is also satisfied as JNS Aviation is obviously a party to both the underlying suit and the present action. Nick Corp. need not relitigate its breach of contract claim as a condition to seeking recovery against the Non-Debtor Defendants under its asserted theories of veil piercing.

Apart from the above analysis, the Sheltons can, as well, be considered in privity with JNS Aviation. The Fifth Circuit has held that, for res judicata purposes, privity is satisfied: "(1) where the non-party is the successor in interest to a party's interest in property; (2) where the non-party controlled the prior litigation; and (3) where the non-party's interests were adequately represented by a party to the original suit." *Meza v. General Battery Corp.*, 908 F.2d at 1266 (citing *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 188 (5th Cir. 1990)). The assets of JNS Aviation were first transferred to Jim and Malcolm Shelton on their way to JNS Aircraft Sales. Both Jim and Malcolm Shelton were successors in interest to the assets of JNS Aviation. They were the equity shareholders of JNS Aviation at the time the Default Judgment was taken against JNS Aviation and made the decision on behalf of JNS Aviation to suffer the Default Judgment.

In addition, the Sheltons, especially Jim Shelton, can also be viewed as non-parties who both controlled the prior litigation and whose interests were represented by a party, JNS Aviation, to the original suit. *See Drier v. Tarpon Oil Co.*, 522 F.2d 199, 200 (5th Cir. 1995) (president and majority shareholder of company who made the "ultimate decisions" for the company was found to be in privity with the company and, having control of lawsuit, was thereby precluded from relitigating the issue of the company's liability in a subsequent federal suit against both the company and himself individually). Although the Fifth Circuit was specifically concerned with the issue of collateral estoppel in *Drier v. Tarpon Oil Co.*, the court mentioned that the privity analysis would be the same had res judicata been at issue. *See id.* It stated, "[t]he general rule is that a final judgment is res judicata or collateral estoppel applies only between parties to the earlier lawsuit *or their privies*." *Id.* (emphasis added).

The fourth requirement of res judicata – that the same cause of action be involved in both actions – is satisfied as the underlying basis of JNS Aviation's liability to Nick Corp., the breach of contract claim, is the same in both suits, *i.e.*, the Delaware federal court suit that resulted in the Default Judgment and the present action. Moreover, the legal wrong, *i.e.*, breach of contract, is the same in both suits. *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 321 (1926).

### C. Evidence of Breach of Contract

Even if principles of res judicata do not dispose of the breach of contract issue, the Court is satisfied that the evidence establishes a breach of contract. The mere fact that the Sheltons allowed the default judgment to be taken is, in the Court's view, some evidence that JNS Aviation breached the Purchase Agreement. Considered collectively, the e-mails between Jim Shelton and Nick Lopardo reveal that JNS Aviation was either unable or unwilling to repurchase BB-595 under the terms of the Guaranteed Repurchase Provision.

The issue of JNS Aviation's repurchase of BB-595 first arose in Nick Lopardo's July 31 e-mail in which he specifically told Jim Shelton that he wanted JNS Aviation to act as his "agent in repurchasing BB-595 and purchasing another aircraft." This request virtually tracked the language of the Guaranteed Repurchase Provision. Shelton resisted the repurchase from the beginning. His response of August 3 made clear that he could not follow through with the repurchase. He stated he was "caught flat footed" and that JNS Aviation had no room under its line of credit to buy another aircraft. He said he never dreamed that Lopardo would "come back in 5 months . . . ." Shelton and Lopardo obviously had several other discussions which are outlined in detail above, but Shelton's tone regarding the actual repurchase of BB-595 never changed. He admitted his "mistake in putting an overzealous contract together . . . ." JNS

- 31 -

Aviation's inability to repurchase BB-595 is underscored by the testimony of Janet Collinsworth, the CPA who assessed JNS Aviation's financial condition.  JNS Aviation simply did not have available funds with which to repurchase BB-595 or funds with which to acquire another plane that would be acceptable to Lopardo.

In a somewhat desperate move, Shelton asserted that Lopardo's purchase of another plane constituted a breach of the Purchase Agreement by Nick Corp.  This charge caused Nick Corp. to commence its lawsuit.  The Sheltons argue that the Repurchase Provision was never properly invoked because Nick Corp., the purchaser under the Purchase Agreement, never purchased a "follow-on" aircraft.  The problem with this position, however, is that it was clear from the first time that Lopardo raised the repurchase option that JNS Aviation would not perform.  In addition, Lopardo's purchase of other aircraft through entities other than Nick Corp. does not mean the Guaranteed Repurchase Provision would not have been properly invoked.  It means, in the Court's view, just the opposite.  The Court is satisfied that Lopardo would have purchased his "follow-on" aircraft through Nick Corp. or, upon agreement or consent of JNS Aviation, through another of Lopardo's entities.

Jim Shelton submits that he construed the Repurchase Provision to mean that Nick Corp.'s next aircraft must be purchased from JNS Aviation.  The language of the Guaranteed Repurchase Provision defies such interpretation.  It cannot be fairly argued that using JNS Aviation as an agent means JNS Aviation must be the seller.  If Nick Corp. was required to purchase from JNS Aviation, such requirement could have easily been stated in the contract.  Jim Shelton, in fact, mentioned this requirement in an e-mail to Bill Arnwine.  The fact that the

provision requires only that JNS Aviation act as agent indicates that JNS Aviation (through Shelton) relaxed the condition.

Jim Shelton's reaction to Lopardo's demand reveals his understanding of the Repurchase Provision. He knew he had made a bad deal for JNS Aviation, a deal it could not honor. His interpretation of the provision in connection with this lawsuit is an after-the-fact, self-serving spin on the meaning of the provision. Besides, JNS Aviation did not have an inventory of planes for Lopardo's consideration. It would have had to find a plane satisfactory to Lopardo which would have required either JNS Aviation's purchase of such plane and resale to Nick Corp. or Nick Corp.'s direct purchase from a third-party seller with JNS presumably receiving a commission. The economic substance is essentially the same under either scenario.

    D. <u>Nick Corp.'s Standing</u>

        1. <u>Standing Argument Foreclosed</u>

By concluding that the Non-Debtor Defendants are barred from relitigating the breach of contract claim, the Court has, as well, disposed of their contention that Nick Corp. has no standing to prosecute this case because the Purchase Agreement was never properly assigned to Nick Corp. Contesting the validity of the assignment to Nick Corp. is, in effect, the same as contending that there was no breach of contract. Under either argument, the Non-Debtor Defendants are attempting to attack the underlying liability as evidenced by the Default Judgment. These arguments are foreclosed by the Court's holding that the Delaware suit cannot

be relitigated, as well as the Court's conclusion that the evidence before it supports a breach of contract.[6]

### 2.  Evidence of Assignment

Regardless, the Court will address whether the evidence supports a conclusion that Nick Corp. is the proper party to bring suit under the Purchase Agreement.  The Purchase Agreement was prepared by Bill Arnwine, who was working with the Sheltons.  As noted, Arnwine is not a lawyer, he is an airplane broker.  The Purchase Agreement was signed by Jim Shelton for JNS Aviation, the seller, and by Nick Lopardo on behalf of Kahuna Partners III, LLC, as purchaser.  It is dated April 6, 2001.  Appendix A to the Purchase Agreement is a detailed description of BB-595.  Appendix B is the "Delivery and Acceptance Receipt," dated May 11, 2001; it refers to the April 6, 2001 Purchase Agreement and states that the undersigned, Kahuna Partners III, LLC, the purchaser, took delivery of the aircraft on May 11, 2001.[7]  As set forth above, the Purchase Agreement has three amendments attached to it in the following order:

- •    Amendment 2 - "Revised Purchase Price," dated May 10, 2001, signed by Jim Shelton for JNS Aviation, as seller, and by Nick Lopardo, for Nick Corp., as purchaser; this document reflects an adjustment to the purchase price by increasing it by $13,747.53.

- •    Amendment 3 - "Escrow Holdback," also dated May 10, 2001, and signed by Jim Shelton for JNS Aviation, as seller, and Nick Lopardo for Nick Corp., as purchaser.

---

[6]The question of whether Nick Corp. is the proper party to bring this action is addressed again below in connection with its fraud claims against Jim Shelton.

[7]A handwritten notation on the signature page Appendix B references "Nick Corp."  The Court assumes this notation was added after the document was signed in May and was possibly added to a separate slip of paper that was affixed to Appendix B.  The Court cannot attribute any significance to the handwritten note.

&bull; Amendment 1 - "Assignment of Purchase Agreement," dated May 4, 2001, and signed by Jim Shelton for JNS Aviation, as seller, and Nick Lopardo on behalf of both Kahuna Partners III, LLC, as assignor, and Nick Corp. as assignee.

Amendment 1 - "Assignment of Purchase Agreement" refers to the April 6, 2001 Purchase Agreement and states that "Seller [JNS Aviation] and Purchaser [Kahuna Partners III, LLC] *agree to an assignment* of the entirety of the Purchase Agreement from Kahuna Partners III, LLC to . . . Nick Corp."  (Emphasis added).

The Guaranteed Repurchase Provision is attached to the Purchase Agreement as Addendum 1.  Both the Purchase Agreement and the Guaranteed Repurchase Provision are dated April 6, 2001.  The Guaranteed Repurchase Provision is signed by Jim Shelton for JNS Aviation, as seller, and Nick Lopardo for Kahuna Partners III, LLC, as purchaser.

There are two basic problems with the Purchase Agreement, which give rise to the contentions made by the defendants in this case.  First, the named purchaser under the Purchase Agreement, Kahuna Partners III, LLC, never existed and therefore the purported assignment is made from a nonexistent entity.  Second, the language of the assignment,  "agree to an assignment," indicates a prospective assignment via a separate instrument.

It is undisputed that Nick Corp. both paid the purchase price of approximately $1.9 million and physically took possession of BB-595.  Jim Shelton admitted that, as a practical matter, he considered Nick Corp. as the ultimate purchaser.  Both the title of the assignment instrument, "Assignment of Purchase Agreement," and its date, May 4, 2001, relative to the date of delivery of the aircraft to Nick Corp. (May 11, 2001), indicate a present assignment.

While the document itself creates an ambiguity, such ambiguity is removed by the actual delivery of BB-595 to Nick Corp. and the payment by Nick Corp. of the purchase price.  The

Court finds that Nick Corp. was assigned the Purchase Agreement and is thus the proper party to sue under the Purchase Agreement.

The remaining problem, then, is identifying the assignor given that Kahuna Partners III, LLC ("Kahuna Partners") never existed.  If a corporation is nonexistent, it cannot have an agent; the individual who considers forming the corporation acts only as a promoter, not as an agent. *Fish v. Tandy Corp.*, 948 S.W.2d 886, 897 (Tex. App.--Fort Worth 1997, writ denied).  When a promoter enters into a contract on behalf of an unformed corporation, the promoter "is personally liable on the contract unless (1) there is an agreement with the contracting party that the promoter is not liable, (2) the contract is made in the name and on the credit of the proposed corporation and the contracting party knows that the corporation does not yet exist, or (3) the corporation adopts the agreement after its incorporation." *Hardy v. Southwestern Bell Yellow Pages, Inc.*, No. 05-99-01962-CV, 2001 WL 73251, *3 (Tex. App.--Dallas 2001, pet. denied).

Texas courts have held that "a promoter can be personally liable for entering into a contract for an unformed corporation," and "[b]ecause any enforceable agreement is mutual and binding on both parties, logic dictates a promoter who is liable under an agreement may also make a claim under such a contract." *Fish v. Tandy Corp.*, 948 S.W.2d at 897.

In the case at hand, Nick Lopardo signed the Purchase Agreement, dated April 6, 2001, on behalf of Kahuna Partners.  Kahuna Partners never existed.  There is no evidence that JNS Aviation was aware of Kahuna Partners' non-existence.  Indeed, Nick Lopardo testified at trial that he had only recently realized that Kahuna Partners was never formed.  While Lopardo may have a busy, involved lifestyle, he must be charged with knowledge that Kahuna Partners did not exist when he entered into the Purchase Agreement.  He is deemed to be the purchaser under the

Purchase Agreement.  He was personally liable as the purchaser as none of the three exceptions are satisfied.  He is therefore deemed the assignor under the May 4, 2001 Assignment of Purchase Agreement.

### E.  The Veil-Piercing Claims

#### 1.  Applicability to Limited Liability Companies

Having resolved that JNS Aviation is indebted to Nick Corp, as evidenced by the Default Judgment, the Court turns to the veil-piercing claims made by Nick Corp.  The threshold question here concerns the applicability of veil-piercing claims to a limited liability company. Section 101.114 of the Texas Business Organizations Code (the "TBOC") provides that "a member or manger is not liable for a debt, obligation, or liability of a limited liability company, including a debt, obligation, or liability under a judgment, decree, or order of court." TEX. BUS. ORG. CODE ANN. § 101.114 (Vernon 2006).  JNS Aviation is a limited liability company.  The Sheltons contend, therefore, that this provision shields them from Nick Corp.'s veil piercing claims.  The recent Texas appellate court case, *McCarthy v. Wani Venture, A.S.*, W.L. 1845088 (Tex. App.--Houston [1 Dist.] June 28, 2007), refutes the Sheltons' argument, holding that the veil-piercing theories that apply to corporations apply as well to limited liability companies.  The court there recognized that the Texas Limited Liability Company Act does not address whether or under what circumstances a litigant may "pierce" the corporate veil of an LLC to hold a member liable for a debt of the LLC.  *Id*. at *15.  But, the court noted that

> Texas courts and other jurisdictions, have applied to LLCs the same state law principles for piercing the corporate veil that they have applied to corporations. *See e.g. Pinebrook Props. Ltd. v. Brookhaven Lake Prop. Owners' Ass'n*, 77 S.W.3d 487, 499 (Tex. App.--Texarkana 2002, pet. denied) (applying corporate alter ego veil piercing precedent in analyzing plaintiff's attempts to pierce veil of LLC). . . .

- 37 -

*Id*.

### 2. Texas Law of Veil Piercing

Section 2l.223 of the TBOC specifically addresses the assertion of veil-piecing theories to

Texas corporations.  The statute provides as follows:

> (a)  **A holder of shares**, an owner of any beneficial interest in shares, or a subscriber
> for shares whose subscription has been accepted, or any affiliate of such a holder, owner,
> owner, or subscriber of the corporation, **may not be held liable to the corporation
> or its obligees with respect to:**
>> (1)  the shares, other than the obligation to pay to the corporation the full
>> amount of consideration, fixed in compliance with Sections 21.157-21.162,
>> for which the shares were or are to be issued;
>> (2)  **any contractual obligation of the corporation or any matter relating
>> to or arising from the obligation on the basis that the holder**, beneficial
>> owner, subscriber, or affiliate **is or was the alter ego of the corporation or
>> on the basis of actual or constructive fraud, a sham to perpetrate a fraud,
>> or other similar theory**; or
>> (3)  **any obligation of the corporation on the basis of the failure of the
>> corporation to observe any corporate formality**, including the failure to:
>>> (A)  comply with this code or the articles of incorporation or bylaws
>>> of the corporation; or
>>> (B)  observe any requirement prescribed by this code or the articles
>>> of incorporation or bylaws of the corporation for acts to be taken by
>>> the corporation or its directors or shareholders.
> (b)  **Subsection (a)(2) does not prevent or limit the liability of a holder**, beneficial
> owner, subscriber, or affiliate **if the obligee demonstrates that the holder**, beneficial
> owner, subscriber, or affiliate **caused the corporation to be used for the purpose
> of perpetrating and did perpetrate an actual fraud on the obligee primarily for
> the direct personal benefit of the holder**, beneficial owner, subscriber, or affiliate.

TEX. BUS. ORG. CODE ANN. § 21.223 (Vernon 2006) (emphasis added).

The Texas Supreme Court in *Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986)

summarized Texas law on veil piercing as follows:

> We disregard the corporate fiction, even though corporate formalities have been
> observed and corporate and individual property have been kept separately, when the

corporate form has been used as part of a basically unfair device to achieve an
inequitable result. Specifically, we disregard the corporate fiction:

(1) when the fiction is used as a means of perpetrating fraud;
(2) where a corporation is organized and operated as a mere tool or business conduit
of another corporation;
(3) where the corporate fiction is resorted to as a means of evading an existing legal
obligation;
(4) where the corporate fiction is employed to achieve or perpetrate monopoly;
(5) where the corporate fiction is used to circumvent a statute; and
(6) where the corporate fiction is relied upon as a protection of crime or to justify
wrong.

*Id*. at 271-72 (citations and footnotes omitted).[8]

The Fifth Circuit in two opinions, *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d

1106 (5th Cir. 1988), and *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275 (5th Cir. 1988),

explained its "bewilderment at some of the nuances of the Castleberry opinion" and, in so doing,

distilled the six (or perhaps seven) strands of corporate disregard down to three: (1) the alter ego

prong; (2) use of the corporate form as an illegal purpose or, stated otherwise, to avoid legal

limitations upon natural persons or corporations; and (3) sham to perpetrate a fraud. *Id*. at 1287-

1290.

3. Liability of Non-Debtor Defendants under Veil Piercing

JNS Aviation's obligation to Nick Corp. is evidenced by the Default Judgment, which, as

discussed above, is based on a breach of contract. Texas law provides that section 21.223 of the

TBOC applies to JNS Aviation. To determine if the Non-Debtor Defendants, particularly Jim

Shelton and Malcolm Shelton, are liable under the asserted veil-piercing theories, the Court must

_____

[8]As has been noted by the Fifth Circuit in *Gibraltar Sav. v. LDBrinkman Corp.*, 860 F.2d 1275 (5th Cir. 1988),
the Supreme Court, in a footnote immediately following the listed six theories of veil piercing, added a seventh ground
for veil piercing, stating that "inadequate capitalization is another basis for disregarding the corporate fiction."

- 39 -

analyze both the question of whether the facts satisfy any of the asserted veil-piercing strands and the question of whether any of the Non-Debtor Defendants caused JNS Aviation to be used for the purpose of perpetrating and did perpetrate an actual fraud on Nick Corp. primarily for the direct personal benefit of the considered defendant. The Court, in effect, must sift the facts through the outlined legal framework of veil piercing as limited by section 21.223 of the TBOC.

Using *Gibraltar Savings* as a roadmap of the law of veil piercing or corporate disregard in Texas, the Court considers whether Nick Corp. has satisfied any one of the three strands of veil piercing. The Court will consider Nick Corp.'s assertion of liability under the single business enterprise theory with the alter ego strand identified in *Gibraltar Savings*. As noted in *Gibraltar Savings*, "there is nothing in the 'alter ego' strand to suggest that anything more is required than the failure of the owners to maintain the corporation as a distinct legal entity." *Id*. at 1288. Alter ego "focuses upon the relationship between the corporation and its owners and not upon the relationship between the corporation and the claimant-creditor." *Id*. The Court looks to the total dealings between the corporation and the individual, including the degree to which corporate formalities have been maintained, whether corporate and individual assets have been kept separately, the financial interests, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. *See id.*

The single business enterprise theory of corporate disregard is similar in purpose to alter ego, but is not considered synonymous with the alter ego strand. *North America Van Lines, Inc. v. Emmons*, 50 S.W.3d 103 (Tex. App.--Beaumont 2001). The single business enterprise doctrine is an equitable doctrine applied to reflect partnership type liability principles when corporations integrate their resources and operations to achieve a common business purpose. 15 TEX. JUR. 3D

*Corporations* § 173 (2007).  Under the single business enterprise theory, when corporations are

not operated as separate entities but rather integrate their resources to achieve a common

business purpose, each constituent corporation may be held liable for debts incurred in the

pursuit of that business purpose.  *Id.*  As opposed to "piercing" through the corporate shield to

hold a shareholder or perhaps another affiliated company liable, the single business enterprise

doctrine recognizes the corporate shields of the two companies but treats the two as partners

given their common business purpose and thereby subjects each "partner" to the liabilities of the

"partnership" formed by their relationship.

Nick Corp.'s claim that Jim Shelton and Malcolm Shelton used JNS Aviation and/or JNS

Aircraft Sales to evade existing legal obligations falls under the "illegal purpose" strand identified

in *Gibraltar Savings*.  "As with 'alter ego' proper, the focus is on the relationship between and

among the corporation, its owners, and the laws of the state rather than on the relationship

between the claimant and the corporation . . . ."  *Id.*  A creditor's recovery under this strand may

constitute a windfall as the claim may be unrelated to the illegal purpose.  *Id.*  This strand is

usually an alternative basis to a "alter ego" or "sham to perpetrate a fraud" case.  *Id.*

The third strand, sham to perpetrate a fraud, is at least labeled by Nick Corp. as it is in

*Gibraltar Savings*.  Addressing this strand, the Fifth Circuit in *Gibraltar Savings* states that

"[f]or the first time, the focus of veil-piercing analysis is on some inequitable result for the

*claimant*, because of abuses of the corporate form."  *Id.* at 1289.  "[T]his category allows a

corporate disregard in a much broader range of cases than those strictly speaking of fraud . . . ."

*Id.* at 1289 (citing *Castleberry*, 721 S.W.2d 272-73)..  Neither intentional fraud nor intent to

defraud need be shown to satisfy this strand.  *Id.*  The sham strand is the catchall and broadest

form of piercing.  Looking to *Castleberry*, the Fifth Circuit stated as follows:

> The [*Castleberry*] court emphasized that this standard for corporate disregard is
> whether honoring legal independence would result in "inequity" or "injustice"; the
> purpose "is to prevent use of the corporate entity as a cloak for fraud or illegality or
> to work an injustice, and that purpose should not be thwarted by adherence to any
> particular theory of liability.

*Id*. at 1289 (citing *Castleberry*, 721 S.W.2d at 273).  Based on equity, this strand is limited only

by its focus on injustice or unfairness to the claimant-creditor caused by the corporation and its

owners.  *Id*. at 1289 (citing *Pan Eastern*, 855 F.2d at 1133).  It is emphasized that in contract

cases, the inequity frequently comes from reasonable reliance on the financial backing of the

owners.  *Id*.  Reliance  is deemed critical.  *Id*.  *Castleberry* provides examples:

> The variety of shams is infinite, but many fit this case's pattern: a closely held
> corporation, owes unwanted obligations, it syphons off corporate revenues, sells off
> much of the corporate assets, or does other acts to hinder the on-going business and
> its ability to payoff its debts.

*Castleberry*, 721 S.W.2d at 275.

The three strands typically overlap.  The Fifth Circuit in *Gibraltar Savings* emphasized

that "the different species of corporate disregard seldom occur in pure form," that, for example,

alter ego is usually accompanied by assertions of unfairness to the claimant.  860 F.2d at 1288.

The cases that address veil-piercing theories as a basis to impose liability rarely differentiate as

among the various forms or strands the one form or strand that justifies a finding of liability.  *See*

*id*.; *Pan Eastern*, 855 F.2d at 1132.  This, of course, makes the task of this Court as both the fact

finder and arbiter of the law, all the more difficult.  The Court, in addition, recognizes that equity

plays a major role and that there is some flexibility accorded a court in deciding a veil-piercing

claim.  The Texas Supreme Court in *Castleberry* stated as follows:  "In practice, the doctrine of

disregarding the corporate fiction functions to 'loosen up the level of proof and the atomistic nature of the analyses required in a fraudulent conveyance action explicitly denominated as such.'" *Castleberry*, 721 S.W.2d at 270 n.1 (citing R. Clark, *The Duties of the Corporate Debtor to Its Creditors*, 90 Harv. L. Rev. 505, 540-54 (1972)).[9]

The facts here satisfy several factors that are typically associated with the alter ego and single business enterprise theories of corporate disregard. As stated in *Gibraltar Savings*, the focus under the alter ego strand is on the relationship between the corporation and its owners. 860 F.2d at 1288. The corporate entities, JNS Aviation and JNS Aircraft Sales, are essentially the same company, which was, in fact, the purpose of establishing JNS Aircraft Sales. JNS Aircraft Sales has the same assets, employees, office, owners (the Sheltons), and customers as did JNS Aviation. The one distinction, of course, is that JNS Aircraft Sales did not assume the one major liability of JNS Aviation, the debt to Nick Corp. The Sheltons and their various entities filed consolidated tax returns; the Sheltons used JNS Aviation and JNS Aircraft Sales as an investment source to obtain a higher rate of interest on loans or contributions made; there was some occurrence of the company paying for personal items of the Sheltons. Everything either company did was set in motion by the Sheltons.

The facts do not fit perfectly within the alter ego strand, however, as JNS Aircraft Sales, in effect, succeeded JNS Aviation. The Court cannot conclude that either JNS Aviation or JNS Aircraft Sales was not maintained as a separate legal entity. The evidence perhaps best satisfies a denuding theory rather than alter ego in its pure form.

---

[9]*Castleberry* also noted doctrines other than veil piercing that are invoked as a means to hold third-parties (or assets of third-parties) liable for the debt or debts of a primary obligor. *Id.* These include fraudulent conveyance, the trust fund doctrine, breach of fiduciary duties, and the denuding theory. *Id.*

The facts here have elements of a single business enterprise, as well.  JNS Aviation and JNS Aircraft Sales had a common business purpose – they in fact had the same business purpose.  But, as with alter ego, the facts do not exactly fit the doctrine as JNS Aviation and JNS Aircraft Sales did not operate together at the same time.

The facts here certainly suggest an attempt to evade an existing legal obligation thereby, according to Nick Corp., bringing this case under the illegal purpose strand.  The "existing legal obligation" sought to be avoided is the Default Judgment.  It is not clear, however, that an existing civil judgment is the type of legal obligation contemplated by the courts under this theory.  *See Gibraltar Savings* 860 F.2d at 1288.  The illegal purpose doctrine is described as relating to the use of a corporate forum as a technique for avoiding legal limitations upon natural persons or corporations.  15 TEX. JUR. 3D *Corporations* § 174 (2007) citing *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106 (5th Cir. 1988).  The focus is on obligations or limitations imposed by the state.  It does not appear to address obligations arising as a result of a contract between two parties as in the instant case.

As should be expected, the facts best fall within the third strand, sham to perpetrate a fraud.  The three theories typically overlap, with the sham strand serving as the catchall.  The Court is satisfied that the overriding purpose of closing down JNS Aviation and continuing operations under JNS Aircraft Sales's shield was to isolate Nick Corp.'s Default Judgment in a worthless shell.  The facts fit perfectly within the common fact pattern for a sham identified by the Texas Supreme Court in *Castleberry*.  But the Court recognizes that the typical reliance factor – that, in contract cases, the inequity typically results from the creditor's reasonable reliance on the financial backing of the owners – is missing.

- 44 -

Upon considering the evidence, and thus the established facts, the Court concludes that Nick Corp. has established a claim of veil piercing under Texas law. In reaching this conclusion, the Court follows the guidance provided by the Fifth Circuit in *Gibraltar Savings*. This leads to the ultimate issue that must be resolved under the umbrella of the veil-piercing claims before the Court: do the same facts establish that Jim Shelton and Malcolm Shelton caused JNS Aviation (and/or JNS Aircraft Sales) to perpetrate and did actually perpetrate an actual fraud for the personal benefit of the Sheltons?

Actual fraud occurs when (i) a party conceals or fails to disclose a material fact within the knowledge of that party; (ii) the party knows that the other party is ignorant of the fact and does not have an equal opportunity to discover the truth; (iii) the party intends the other party to take some action by concealing or failing to disclose the fact; and (iv) the other party suffers injury as a result of acting without knowledge of the undisclosed fact. *Bradford v. Vento*, 48 S.W.3d 749, 754-55 (Tex. 2001). It cannot be disputed that Jim Shelton and Malcolm Shelton "caused" JNS Aviation and JNS Aircraft Sales to take the actions that were taken. In the recent case of *McCarthy v. Wani Venture, A.S.*, W.L. 1845088 (Tex. App.--Houston [1 Dist.] 2007), the Court of Appeals held that:

> actual fraud can be the concealment of material facts or the failure to disclose a material fact. *See Custom Leasing, Inc. v. Texas Bank & Trust Co.*, 516 S.W.2d 138, 142 (Tex. 1974).
> . . .
> As a general rule, a failure to disclose information will constitute fraud when there is a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Thus, silence may be equivalent to false representation when the particular circumstances impose a duty on the party to speak and he deliberately remains silent. *Id*.

*Id*. at *9-10.

- 45 -

Nick Corp. sued JNS Aviation in April 2002.  JNS Aircraft Sales was formed as a New Mexico company the very next month, May 2002.  By July 2002, the assets of JNS Aviation were distributed to the Sheltons who, in turn, transferred the assets to JNS Aircraft Sales.  The Sheltons affirmatively elected to allow Nick Corp. to take a default judgment against JNS Aviation, which was entered on June 12, 2002.  The stated reason for JNS Aircraft Sales's formation, to avoid ad valorem taxes, is not legitimate and thus not plausible.  JNS Aviation did not transfer the liability under the Default Judgment to JNS Aircraft Sales.  There is no evidence that the Sheltons or either JNS Aviation or JNS Aircraft Sales provided any formal notice to Nick Corp. of transfers to and formation of JNS Aircraft Sales.  They simply hoped that Nick Corp. would go away along with the orchestrated demise of JNS Aviation.

A company that ceases operations, liquidates, and closes down has a duty to advise its outstanding creditors of such facts.  *See e.g.* Art. 6.05(2) Texas Limited Liability Company Act.  That JNS Aviation had closed down was certainly a material fact to Nick Corp.  The Sheltons, on their own behalf and for JNS Aircraft Sales, contend that Nick Corp. suffered no damages as a result of the foregoing described transactions because JNS Aircraft Sales's financial condition was, in reality, no better or worse than JNS Aviation's.  Neither had the ability to satisfy the Default Judgment.  While there is a question of whether either entity had the ability to satisfy even a portion of the Default Judgment, the Court is convinced that Nick Corp. suffered injury as a result of the various transactions orchestrated by the Sheltons and their companies.  Had the Sheltons and their companies been honest with Nick Corp., it may have very well have staved off the second round of litigation that has resulted in the lawsuit before this Court.  This would have avoided the considerable attorney's fees incurred by Nick Corp. in pursuing its claim.

- 46 -

Finally, the Court must consider whether the fraud that was perpetrated by JNS Aviation and JNS Aircraft Sales was for the personal benefit of Jim or Malcolm Shelton.  The purpose of the transfers of assets from JNS Aviation and ultimately to JNS Aircraft Sales was to continue the business operations unencumbered by the Default Judgment.  Jim and Malcolm Shelton were the sole owners of JNS Aviation and JNS Aircraft Sales.  In deciding to transfer the assets and to effect the transactions they did, they had to be acting in their own best interests.  They were not looking to protect an entity or any other shareholders.  No other shareholders (members) existed.  They had  no other interest to serve.  The Court concludes that they were seeking to continue the operations for their own personal benefit.  The Court concludes that this fraud issue, isolated within the context of Nick Corp.'s veil-piercing claims, must be resolved in favor of Nick Corp.

F.  Fraud Claim Against Jim Shelton

Nick Corp. contends it was defrauded by Jim Shelton in connection with its purchase of BB-595.  Nick Corp. says Jim Shelton defrauded it by (1) making representations that indicated that JNS Aviation was a substantial business with many assets, and (2) including the Guaranteed Repurchase Provision as part of the Purchase Agreement when, in fact, JNS Aviation either had no ability to honor the provision or the intent to honor the provision if called upon to do so.

Nick Lopardo testified that during his trip to Amarillo, in late March 2001, Shelton made specific references to "his" hangars and "his" aircraft when showing Lopardo the aircraft that may be available for sale.  Neither Shelton nor JNS Aviation owned the hangars or all the aircraft that were shown to Lopardo during his visit to Amarillo.  Shelton disputes making such comments and submits that if anything was said along those lines it was purely casual in nature and that it would not be reasonable to rely upon such comments as part of a decision to purchase

a high-dollar aircraft. The testimony of both Lopardo and Jim Shelton in this regard is made after the fact and is self-serving. The Court does not believe that such comments, if made, had any bearing on Lopardo's decision to purchase BB-595. Nick Lopardo is a sophisticated businessman. He and Shelton were negotiating and each was aware of the posture taken by the other. Shelton was trying to sell a plane for the highest possible price and Lopardo was looking to buy a plane and, in so doing, wanted the best deal he could get. Even assuming that Shelton made such statements, which would have been inaccurate, the Court does not believe that Lopardo's decision to purchase BB-595 was materially influenced by such statements. They may have left Lopardo with a favorable impression of Shelton, but that is not sufficient to justify a fraud finding. The Court's conclusion is subject to the following decision that addresses whether Nick Corp. is the proper party to bring the fraud claim.

The fraud claim that is based on the Guaranteed Repurchase Provision is more problematic. It is a material and significant provision within the Purchase Agreement. The Court believes it did, at least in part, induce Lopardo to purchase BB-595. The critical point, however, is that it may have induced *Lopardo* to purchase the plane. It was disclosed at trial that the actual named purchaser under the Purchase Agreement, Kahuna Partners, never existed and hence there was no assignment from such entity to Nick Corp. The Court has concluded that Nick Lopardo was, in effect, the purchaser and thus the assigning party to Nick Corp. Nick Corp. submits that, as a practical matter, it was the real party in interest and thus should be considered the purchaser. But the Court cannot simply ignore the substance of the transaction. The negotiations were exclusively between Jim Shelton and Nick Lopardo. The representations contained within the Purchase Agreement, the Guaranteed Repurchase Provision, and in negotiations leading up to the

execution of these documents were all made to Nick Lopardo.  In a case replete with various

allegations and evidence of the improper use and maintenance of closely held corporate entities,

the Court cannot fairly consider the statements made by Jim Shelton during the negotiations to

have been made to anyone or any entity other than Nick Lopardo.  The fraud claims exist apart

from the breach of contract claim and the Court must consider whether the fraud claims are

indeed held by Nick Corp.

Although the general rule provides that causes of actions are assignable, Texas courts

have fashioned a number of exceptions to this rule where the assignment would violate public

policy.[10]  The Texas Supreme Court has held that assignments violate public policy in four

instances:  (1) a cause of action for legal malpractice arising out of litigation, (2) Mary Carter

agreements, (3) a plaintiff's claim against one joint tortfeasor to another joint tortfeasor as part of

a settlement between the plaintiff and the assignee tortfeasor, and (4) interests in an estate.  *State

Farm Fire & Casualty Co. v. Gandy*, 925 S.W.2d 696, 707-11 (Tex. 1996).

None of these exceptions fits the facts of the current case.  Absent law that provides

otherwise, a claim of fraud or fraudulent inducement, or both, should be properly assigned under

the facts of this case.

---

[10]*See, e.g.,* State Farm Fire & Casualty Co. v. Gandy, 925 S.W.2d 696 (Tex. 1996) (invalidating insured's prejudgment assignment of claims against liability insurer to tort victim as against public policy because it tended to cause collusion); Elbaor v. Smith, 845 S.W.2d 240 (Tex. 1992) (invalidating Mary Carter agreement, in which plaintiff assigns part of a cause of action to settling defendant); Int'l Proteins Corp. v. Ralston–Purina Co., 744 S.W.2d 932, 934 (Tex. 1988) (invalidating joint tortfeasor's purchase of cause of action from plaintiff to whose injury joint tortfeasor contributed); City of Garland v. Booth, 971 S.W.2d 631 (Tex. App.-- Dallas 1998, pet. denied) (invalidating assignment of legal malpractice claim as against public policy); Vinson & Elkins v. Moran, 946 S.W.2d 381 (Tex. App.-- Houston [14th Dist.] 1997, writ dism'd by agr.) (invalidating assignment of claim against attorney rooted in the Texas Deceptive Trade Practices Act); Bates v. First State Bank in Caldwell, 105 S.W.2d 784, 786 (Tex. Civ. App.--Galveston 1937, writ dism'd w.o.j.) (invalidating assignment of public officials right to payment of unearned salary or fees because allowing assignment would impair the official's service).

The Texas Supreme Court qualified the ability of an assignor to assign personal claims when it held that "[u]nless a contrary intention is manifest or inferable, an assignment ordinarily carries with it all rights, remedies, and benefits which are incidental to the thing assigned, *except those which are personal to the assignor and for his benefit only. Jackson v. Thweatt,* 883 S.W.2d 171, 176 (Tex.), *cert. denied,* 513 U.S. 872, 115 S.Ct. 196, 130 L.Ed.2d 127 (1994) (citing 6A C.J.S. Assignments, § 76 (1975). The questions in this case, then, are whether the claims of fraud or fraudulent inducement are claims that are "personal to the assignor and for his benefit only" and thus not assignable under the contract, and whether there was intent manifest or inferable under the circumstances to assign the fraud claims under the contract. *Id*.

In *Jackson*, the Texas Supreme Court examined the cases cited in Corpus Juris Secundum that support the general rule and found that "rights 'personal' to the assignor are those which, although relating to the property assigned, constitute accrued causes of action that may be asserted independently of ownership of the property." *Id*. (citing *Breidecker v. General Chem. Co.,* 47 F.2d 52 (7th Cir.1931) (conveyance of land held not to constitute an assignment of the grantor's cause of action for damages previously sustained for trespass upon the land conveyed); *Huston v. Ohio & Colorado Smelting & Ref. Co.,* 63 Colo. 152, 165 P. 251 (1917) (assignment of stock held not to transfer assignor's cause of action for fraud in connection with the stock's purchase).

In Texas, fraud claims are personal to the defrauded party. *Vial v. Gas Solutions, Ltd.*, 187 S.W.3d 220 (Tex. App.--Texarkana 2006, no pet. h.) (citing *Nobles v. Marcus,* 533 S.W.2d 923, 927 (Tex. 1976). Thus, an assignee of a contract that was not a party to the fraudulent transaction and who was not specifically assigned causes of action for fraud is not the proper

party to sue.

In the *Nobles* case, cited *supra*, judgment creditors of a corporation ("plaintiffs") sought to set aside a deed executed by the judgment debtor ("defendant") to some co-defendants on grounds of fraud or forgery in connection with the execution of the deed. *Id*. at 925. The plaintiffs did not plead fraudulent conveyance as to them as grounds for recovery. *Id*. In its analysis of the case, the court stated the following:

> It is a fundamental rule of law that only the person whose primary legal right has been breached may seek redress for an injury. In *American Nat. Ins. Co. v. Hicks*, a right of action was defined as follows: "The right to maintain an action depends upon the existence of what is termed a cause of action, which involves the combination of a right on the part of the plaintiff and a violation of such right by defendant." Without breach of a legal right belonging to the plaintiff no cause of action can accrue to his benefit. A suit to set aside a deed obtained by fraud can only be maintained by the defrauded party.

*Id*. (citations omitted). Because the plaintiffs failed to plead that the conveyance of the property was fraudulent as to them and because they were not parties to the transaction from which the alleged fraud arose, they had no standing to sue. The Court concludes that, absent assignment of the purported fraud claims to Nick Corp., such claims must fail as brought by an improper party.

G. The Trustee's Objection to Claim

The trustee, Kent Reis, objected to Nick Corp.'s proof of claim. The Court's findings and conclusions, particularly the Court's conclusion that the evidence establishes a breach of contract resolves the trustee's objection in favor of Nick Corp. *See supra* Part III.C.

## IV. Conclusion

Upon the foregoing, the Court concludes that the corporate veil of defendant JNS Aviation will be disregarded to extend JNS Aviation's liability under the Default Judgment (with

- 51 -

credits as recognized in Nick Corp.'s proof of claim) to defendants Jim Shelton, Malcolm Shelton, and JNS Aircraft Sales. Nick Corp.'s claim of fraud and fraudulent inducement against Jim Shelton is denied. The trustee's objection to Nick Corp.'s proof of claim is denied. Counsel for Nick Corp. is directed to submit a judgment in accordance with this Memorandum Opinion, such judgment to be approved as to form by the trustee and by counsel for defendants.

### End of Memorandum Opinion ###